First case up this morning is number 410-0680, in the interest of your A.D. For the appellant is Roland Cross. You are here, sir? Yes, sir. And for the appellee is John Teefee. Mr. Cross, may I proceed? Yes, I'm a second rather. Okay. I'm sorry. I apologize, Ms. Radcliffe. I see your name was here, and I missed it. You may proceed, Ms. Radcliffe. May I please report? Counsel? Good morning, counsel, justices. My name is Stephanie Radcliffe, and I'm here today with Mr. Cross. On behalf of Lisa Dutton, the biological mother, whose parental rights were terminated in the underlying case, this is a case that began in January of 2008 with an adjudication that placed the minor child in the custody of the state and implemented a service plan and visitation program for the biological mother. The stated goal of these plans was to reunite the mother with her biological child. However, in June of 2010, she found herself at a hearing, the first of two hearings, on the petition to terminate her parental rights. It's at this hearing that the trial court committed an abuse of discretion in excluding relevant evidence to the biological mother's case, essential evidence that... At which hearing was this? This was the first hearing on the petition to terminate parental rights in June of 2010. What was June 23rd? And at this hearing, Mr. Cross sought to present the testimony of Michelle Barnes, who was the sister-in-law of the biological... I'm sorry, the foster mother, and to present other testimony relevant to the bias and the pervasive interference that had been the gravamen of Ms. Dutton's case on behalf... on the part of Catholic Charities. The evidence that the biological mother sought to put forth here was excluded on objection of the state on the grounds of relevance. However, this was an abuse of discretion because this type of evidence is clearly relevant under Illinois case law and was a part of mounting evidence that had been presented that demonstrated that Catholic Charities, and specifically the case worker assigned to the biological mother's case, had treated her case as an adoption from the outset, not as a foster situation where the minor child would be returned to the mother. If that were all true, let's assume it to be true, why did your client not do a better job of what she was supposed to do with regard to what the court told her she was supposed to do? Well, Your Honor, that is the point that we were trying to make when this evidence was offered, that there were some situations where Catholic Charities interfered with the mother's attempts to complete the service plan and to make visitations. There were specific examples presented, for instance, on some of her counseling appointments and some of her evaluations by Catholic Charities where she was evaluated as unsatisfactory, for instance, before she had even been given the opportunity to meet with a Catholic Charities counselor. Well, but that doesn't answer my question. What kept her from doing what she was supposed to do? In part, it was interference on the part of Catholic Charities. What did they do to interfere with her so that she couldn't do what she was supposed to do? There were instances where, well, she needed to complete her service plan, and she needed satisfactory evaluations on her service plan, and there were instances where she was given unsatisfactory evaluations for situations over which she had no control, or, for instance, when she was on the Section 8 waiting list and she got an unsatisfactory evaluation for housing. Well, see, the thing is, this is a hearing on termination. This is not a hearing, and the court isn't addressing the questions with regard to the hearings which were held post-disposition initially. Those are like just review hearings, see what's going on, and so forth. At the hearing on termination, there are formal rules of evidence that the parties have to abide by, and the state has to present evidence showing that she has failed to do what she was supposed to do, and specifically with regard to reasonable progress, that there is no reason to believe after nine months that this child is going to be able to be returned to this woman. That was the question before the trial court. What evidence was there that that decision by the trial courts was mistaken? Well, this question that you stated is supposed to be asked under the Illinois Supreme Court decision in sick. This question is supposed to be asked and answered in the context of circumstances. It's not simply the biological mother's conduct in a vacuum. The biological mother's conduct should be considered in the context of where the child's residence, the actions and statements of others that hinder or discourage visitation, along with whether the parent's failure to visit the child was motivated by a need to cope with personal circumstances rather than a true indifference or lack of concern for the child. So, Your Honor, by denying this type of evidence, the trial court failed to consider Ms. Stenton, the biological mother's conduct, in the context that's required under Illinois law. Well, sick is a case that goes back almost 30 years. We have the CN case and LLS that go back less than 10. And it's progeny talking about, for reasonable progress, the question is whether or not the court can believe that this is a child that's going to be returned to a parent in the near future. On this record, what evidence is there that the trial court's determination was incorrect? Or is this going to be another one of those kids that, if I was going to be trying, Judge, this year and next year and 2014, she's going to still be trying while A.D. goes through a series of foster homes without the permanent home that every child's entitled to? The argument, Your Honor, at the trial court wasn't that the mother was perfect in every way. I didn't say perfect. I said, what reason is there in this record to believe that the trial court erred by concluding that this child, this mother is not going to be prepared to take this child any time in the near future? The trial court doesn't know exact, the trial court wasn't in a position to make this decision because the trial court didn't know all of the relevant circumstances because it foreclosed her avenue of entering evidence that tended to demonstrate that her progress was consistently and purposely interfered with by Catholic Charities and her caseworker. So the answer to that question would be that the trial court doesn't know. Did she testify to herself as to what stopped her from complying? She did testify. Why was that testimony then not properly before the court for its evaluation? She could say, gee, I tried to do it, Judge, but I couldn't, and here's why. There was some of that testimony, and this is just a further, she doesn't know, Your Honor, she doesn't know with certainty what Catholic Charities had been doing and what it had been communicating to the foster family. Catholic Charities isn't on trial here, that's my point. As Judge Sanchez said, the question isn't what they did, the question is what she did. If someone was stopping her from doing the things that she wanted to do to get this child back, who would be a better witness to testify to that than she? Well, Your Honor, she doesn't know the extent of everything that was going on between... Well, she knows if I'm trying to do X and someone stopped me, what keeps you from self-testifying? Your Honor, there were... I want you to answer my question, don't worry about the line. Okay. There were circumstances that she explained, such as her lack of transportation and part of the context that's been required to be considered by the Supreme Court. She did testify to some of the problems that she had communicating with Catholic Charities, who I understand is not on trial, but who was charged with administering this plan and charged with getting this mother back on track and reunited with her child, and blatantly did not do so, did not have this goal in mind. Did the guardian ad litem, Mr. Pryor, agree with you? Yes, Your Honor, the guardian ad litem, he didn't take a strong position at the hearing, but he did say the mother certainly wasn't assisted by representatives of the agency as far as achieving some of her goals, specifically visitation. Did he agree with the termination, or did he object? He didn't object. Okay, thank you, counsel. Mr. Tiefik? Thank you. You may proceed. Oh, I'm sorry, I did not know you split your time. Excuse me. Thank you. You may proceed, Mr. Cross. Judge, let me answer your question, if I can. Okay. I think your question was, what did the biological mother do? Well, she had some employment. It was sporadic, but she did seek employment. She worked at McDonald's and Taco Gringo. She started GED classes, and she was looking into nursing. So she did that. Counseling. She made an agreement with Catholic Charities. She would go to counseling through Memorial. The caseworker did not ever speak to her counselor through Memorial. She testified to this. With regard to drug testing and drug counseling with Triangle, the caseworker testified specifically that she would sometimes hold her referrals for two, three weeks, or even a month, and admitted that with someone who has had drug problems, and they asked for the referral to the drug counseling, it's imperative that you get that referral to wherever the counseling is going to take place immediately just because of the nature of drug problems. So this was her testimony? Yes. The counselor admitted that there were delays in getting her referral to Triangle Center. With regard to visitation. Was the Catholic social services worker asked about any of this? Yes. What did she say? She said that she did not get the referrals to Triangle quickly, and she admitted that that was important in cases where drug abuse is a problem. With the visitation, and I don't want to represent to the three of you that this is a case with great facts. There are bad facts here. I understand that. But with visitation, for instance, Catholic Charities made the biological mother come to the visitations an hour early. Then they would call the foster parents and try to bring the child there. Sometimes she would come. Sometimes she wouldn't. There were three periods of visitation right around the holidays where the mother had said in advance, I want to use one of these periods of visitation to get a holiday picture. Mysteriously, the child was gone at Thanksgiving and the two visitations between Thanksgiving and Christmas. So, I mean, there is a problem here. And all the biological mother is arguing here is that the evidence, I agree that Catholic Charities is not on trial. But you do get to put on evidence about a hindrance, some kind of hindrance. And she was. Well, it seems to me at best, you know, the letter would be cumulative to what she could testify to personally. I don't know that that's true. I don't know. Well, what is it? What do you mean you don't know if it's true? No, I don't know if that's true that it would be cumulative. I don't know what Michelle Barnes would say. If you can imagine, she was not a very friendly witness for me. She could say that Catholic Charities told my sister and brother-in-law that. Did you pass an offer of proof? I told the judge, I explained to the judge what the testimony was for, and that's when he said Catholic Charities is not on trial. I explained what I expected to elicit from the testimony. That's not the same. That doesn't really answer my question. Well, I did not make an offer of proof, but it's a bench trial. It was more informal. I explained to the judge what I hoped to get from the witness, and he agreed with the state that the testimony would be irrelevant. It's clearly not irrelevant. It's clearly relevant if the caseworker or the service provider told the foster family from day one when they said, hey, we're an adopt-only family. If they said, no problem, this is going to be an adoption, you're set. And that's what it sounds like from the letter. That's what it sounds like. It sounds like the foster family said, wait, don't give us this child if you're going to take it back. And Catholic Charities assured this family that that's what would happen. So, I mean, if hearing this evidence, if hearing what this witness said, and then you take it all together. Well, you're asking us to reverse based on the grounds that this evidence would prove to be very important and not cumulative. And we don't know what the evidence would be because you said you're not sure what Michelle Barnes would testify to. You didn't think she'd be favorable. What if it turned out that we reversed, sent it back, Michelle Barnes testifies, and the trial judge says, well, that was pretty much what the respondent mother had already testified to? Or if they said the letter was everything. The letter was everything. Well, I'll tell you what happens. The child doesn't hurt anything. The child's still with the foster family. But the biological mother gets to put on her case. Well, you see, that's the problem, though, with the rules that say if you're asking the appellate court to reverse on the grounds that certain evidence wasn't admitted by the trial court, that's why Illinois law says you have an absolute right to make a formal offer of proof, to put on your witness and to make it clear, unless there's no dispute as to what the evidence in question will be, that doesn't seem to be a standard to fit here when I ask you what she'd say and you say you're not sure. Well, we know from the letter at least the summary of what she was going to say, and the judge said any obstruction essentially by Catholic Charities is not relevant. That's just not Illinois law. Mr. Cross, can I ask you a question? Sure. You indicated that Catholic Charities put conditions so that your client had to show up an hour before visitation. Did those conditions come about, though, as a result of the multiple no-shows? To be fair, yes, they did. They worked both ways. They worked to confirm that the mother was going to be there, but then they would also know that the mother, for instance, at some point the hour-long wait for the child to be there then conflicted with triangle appointments, which were an hour later, so the child wouldn't necessarily be there in an hour. Those would swing the other way, and then the biological mother would get an But this is all evidence which the responding mother, Lisa Denton, is capable of presenting to the judge. All evidence before the judge? Did it all come out? It did. This is what happened, Judge? Yes. To the extent that there's an explanation, to the extent that it's believable, to the extent that this is somehow an exoneration of these failures, this instance, this other instance, we have a trial judge who's sitting there looking at your client and hearing her and the other witnesses and making this call. That's the call that you're saying is contrary to the manifest weight of the evidence. I'm saying the judge should hear what happened between Catholic charities and the foster family when the child was placed. I think the judge should hear that. If after hearing all the evidence he says, you know, this is still a termination, I think I can live with that. See, my problem with the whole idea of the letter, as Judge Sanchez seems to point out, is this. That seems to talk about its nefarious purpose behind certain things it did. Like the trial judge, I can infer the purpose of the things they did, whether there was this conversation or not, whether Michelle Barnes referred to it or not, accurate in the letter. What I'm concerned about is not the purpose, I'm concerned about the acts. What did they do? And anything to stop Lisa Denton from doing what she wanted to do is something that she could, and she would, be the single best source of this testimony. She could testify about it. And there it is. I'm not sure why the letter addresses any of that at all. I think if the letter, if I had no evidence and it was just we didn't comply with the service plan, I would agree with you. But we did have evidence directly from the caseworker about not contacting the counselor, never speaking to the counselor, never making a home visit. When you couple that with the letter, with the letter at the outset of the case when Catholic Charities replaces the child, it says, hey, it's an adopt only case, don't worry about it. Then we've got a problem. Would it be similarly probative had your client said Catholic Services had never worked with me and their purpose was to stop me, and the state said, oh, no, we want to call Ms. Barnes because we have evidence that said from the get go, you said this isn't an adopt only case. Would that be probative? Would that be relevant? It would be relevant. It would be relevant to say that, I guess, for them to talk about the transfer. I mean, the caseworkers testify about all kinds of things. It's relevant in my case, though, because the cases specifically talk about, and I think the state concedes, that hindrances are relevant to this decision of the termination. By the way, did Michelle Barnes, the author of the letter ever herself, talk to the Catholic Social Services? I don't know the answer to that question. Well, in fact, it's all hearsay from her sister, isn't it? But the foster mother was there, too. The foster mother. I mean, the judge said this testimony. Well, who is it you were seeking to call? Michelle Barnes authored the letter. I called her to find out where she got the information in the letter. And she got it all from the foster mother, she says. I don't know. I don't know that. I don't know the answer to that question. So we don't know whether or not this testimony would be. And the objection was hearsay. Well, Susan told me that this is what the Catholic Social Service people told her. We didn't get there. I wasn't allowed to. So we might. You're asking us to reverse, to go back and then permit evidence to come in, that one that comes in isn't admissible because it would be all hearsay. Isn't that true? But the subject matter, then I could call the foster mother. If that's her testimony, that I didn't hear this, then the foster mother could be called. But I was told. But couldn't you have called the foster mother? I was told this evidence wasn't relevant. Did you ask to call the foster mother? I was told. I did not ask to call the foster mother. But I was asked to call the foster mother because the ruling in the court was that evidence about the transfer of what Catholic Charities said to the foster family was not relevant. Was there any allegation made that this is a pattern and practice of Catholic Charities, this type of behavior? No. And I have no evidence that it's a pattern of practice. Other than the letter from the sister of the foster mother. That's Michelle Barnes, right? Yes. Do you have any evidence affirmatively that Catholic Charities tried to stop anything? Or that their purpose was never to work with Lisa Dutton to get her back as the custodial parent? I do have it. I do. And I think the caseworker testified the best on it. She didn't make prompt drug referrals. She never contacted the counselor. Never contacted. Did you ask her why? Yeah. She said she took all and never got a hold of it. So her explanation was, I was negligent or I never got around to it? She didn't use that word. That's essentially what she said? Yeah. She never spoke to the counselor. Did you ask her directly the question? Never made a home visit. Did you ask her directly the question, is it a true social worker that you wanted to place this child in adoption immediately and you never really wanted to get Lisa Dutton back as custodial parent? I believe the state asked that question. She said that was not true. That there was no preordained approach to this case. Okay. Your time is up, counsel. You or Ms. Ratliff will have an opportunity to address this in rebuttal. Thank you. Okay, Mr. Teefee, I guess now would be appropriate. May it please the court, counsel. My name is John Teefee. I'm here on behalf of the people of the state of Illinois. Respondent is claiming that Michelle Barnes' testimony was relevant in this case. And I have two main arguments for why it was not relevant. And my final argument is that even if the court did err, there was no, the respondent cannot show that she was prejudiced in any way from this evidence not being admitted. First, I think we need to look at the remoteness of what it seems like Michelle Barnes' testimony was. The letter specifically said that Ms. Barnes was basing what she knew on conversations that a caseworker had with her sister. So, I mean, we're already dealing with hearsay upon hearsay. And I think the remoteness of the sister of the foster mother testifying about a conversation that the foster mother had with a caseworker. And so right there I just think the remoteness of the testimony itself demonstrates that it's not relevant. Is this the same caseworker who testified? We don't know. The letter vaguely said that it was a caseworker. So we do not even know. From Catholic Social Services? I do not remember if it even said specifically that it was Catholic Charities. I actually do not believe that it said specifically who even the organization was. But I do know that it did not refer to a name of the caseworker. It just remotely said that her sister had had conversations and that a caseworker had told them something to the effect that this case was basically set. My argument is that the remoteness of this conversation makes Michelle Barnes' testimony irrelevant. And Respondents' Council on Appeal even argues here that we don't really know exactly what Michelle Barnes was going to be testifying to. But we do know that they called her to testify based on the contents of this letter. And the contents of this letter just show that Michelle Barnes was basing her testimony or what her complaints were about the way that this case was progressing over this three-year period on conversations that her sister had had with a caseworker. Also, nothing in the letter shows specific examples, although Respondents' Council argues that it shows that the Catholic Charities viewed this case as an adopt-only case from the get-go. Nothing in the letter shows specific examples of impediments or blocks that Catholic Charities had placed to prevent a respondent from doing the things that were required in her service plan. And from there, I want to focus on the things that, specifically from the record, completely separate of anything the caseworker had to do with of the actions that Respondent made that could not have been impeded by Catholic Charities. Regarding the individual counseling, at the fitness hearing specifically, Respondent actually testified that, and this is page 8 of my brief, she says that she attended individual counseling, but she did not complete it, and this is her quote, due to financial issues, and having to pay for counseling on my own, and no medical card, no transportation, and that's basically all. So, regarding individual counseling, Respondent did not testify in any way that Catholic Charities or a caseworker had impeded her ability to complete the individual counseling. And you can look at the, she does say that she had no transportation. The caseworker in this case, Brown, did testify that when Respondent would approach him and she did not have transportation, that he would give her tokens for transportation. Regarding domestic violence counseling at sojourn, Respondent testified that, I did participate with sojourn. It got to where I just, the transportation issues was a problem, and then that's basically all I could say about sojourn. I didn't do sojourn. I participated in sojourn probably three or four sessions. So again, from Respondent's own testimony, she does not blame, the reason that she didn't complete sojourn counseling wasn't because of something that Catholic Charities did. She specifically said it was something she didn't do. I didn't do sojourn. What testimony did she offer about any interference by Catholic Charities? She, and this is, I have it on page 46 and 47 of the record, that Brown, which was her caseworker in Catholic Charities, were unfair to her throughout this case. And she specifically said that she would attempt to call them, but they would not return her calls. She also testified that she attempted to retain referrals from Triangle. She said that she attempted to obtain referrals seven to eight times, but Triangle would not accept her, because Brown did not send the referrals to Triangle. That was her testimony regarding what Brown did, regarding the counseling at Triangle. Also, I think that a lot of what Respondents argue on appeal is that Catholic Charities specifically impeded her ability to visit her daughter, KD. During the course, and I think it's just important to look at the numbers, if you look at the record, some of the numbers were, the total visitations were, the numbers were different a few times. But I think that the disparity in made visits and missed visits never changed. And during the course of this case, Respondent missed 83 out of a possible 117 visits. She missed 83 out of a possible 117 visits. 69 out of those 83 missed visits were no call, no show from Respondent. And so I think you can look at this record, and you might be able to say, you know what, Catholic Charities Did Lisa Denton offer any testimony, was she confronted with these facts at the hearing? Did she offer any explanation? I do not believe that she offered an explanation for why she missed these visits. Where were the visits located? I believe they were at Catholic Charities. Where is that located? I am unsure, Your Honor. But like I said, I think you can look at the totality of this record and say, you know what, I'm not sure that, and if you've done more than a couple of these cases, you realize that never have they done perfectly. And I think you can look at this record and you say, there are things that could have been done differently, there are things that probably should have been done differently, but there are things that Respondent simply failed to do consistently throughout the time of this case that could not have been impeded by anyone except for her conscious choice not to do these things. The record shows that Lisa Denton, her daughter Edie was born June 2007, so she'd be two and a half, let's say, during the time of this visitation period. Does the record show that these visitations were when the child was brought to Catholic Social Services  I'm sorry, could you explain that again, Your Honor? Does the record show regarding the failed visits that the child had been brought to Catholic Social Services offices and Lisa Denton failed to appear? Yes. We also have Respondent tested positive for drugs on two occasions. On April 13, 2009, she tested positive for marijuana.  She was also arrested twice during the life of this case. So all this goes to show that while this case could have and probably should have been handled better, like most of these cases could, Respondent made conscious decisions on a consistent basis not to do the things that she needed to do in order for Edie to return to her care. And if Your Honors do not have any other questions. Yes, I had just one other question. I can't remember, but is my impression correct that Lisa Denton had involvement with social service agencies before this child? Yes, she has had a previous child. Her parental rights were terminated previously. Once or twice? Well, I believe twice. But I'm under the impression that this caseworker, specifically another child with the initials HD, this caseworker, Brown, also handled that case. That was my impression too, but the reason I asked that is I wanted to be sure that whatever else may have happened in those other cases, that this would be an indication, or this would be a situation where Lisa Denton herself would be familiar with the process, certainly more so, and what's at stake and what the courts look at and some woman who had never been through it. I would hope so, Your Honor. I believe that's true. And Brown, even though he did testify that he was involved in the previous case with HD, and he was specifically questioned, did your involvement with that case have anything to do with how you handled this case or the idea that you might have in your head that this is an adopt-only case and we know exactly what's going to happen here? And he testified, no, he did not have the mindset that this was an adopt-only case, but it's impossible also to argue that he wouldn't have in his mind, you know what, Miss Denton has been through this before. She's been through this process. She knows what she needs to do. And AD needs a permanent home the same way that HD. Thank you, Your Honor. Thank you, Mr. Peavy. Mr. Cox? Just briefly, Judge, Miss Brown did work on a previous termination, just to answer the question you had asked, on a previous termination of a child with this mother. Was it one or two children? With Miss, the testimony before the court was Miss Brown worked on one. Okay, but had there been two prior cases involving Lisa Denton? No, it was just one. Okay. The thing I want to stress or the idea I want to stress is that Miss Denton has the right to put on her case and she has the right to put on evidence that shows that there was a hindrance. In this case, and I don't know if there was a personality problem between the caseworker and Miss Denton, I don't know what it was, but there was an obvious hindrance. And she didn't get to put on the evidence. Michelle Bowers was actually on the witness stand when the state objected. Is that correct? That is true. And Judge Sanchez sustained the objection? He did. Why not say, Judge, we'd like to make a formal offer of proof and ask Miss Barnes some questions? Well, I summarized what I expect. I understand. I summarized what she was going to say, and he said, catheterities isn't on trial here. And I understand that. I'm sympathetic even to that statement. The formal offer of proof has two purposes. One is to inform the trial court, but the other is to inform us. But in this case, we know at least some of what Miss Barnes was going to say, is that catheterities treated this case as an adopt-only case from the get-go. And coupled with Chris Brown's testimony, Chris Brown, the caseworker's testimony, who admitted not to talking to the counselor, admitted not to making a home visit, and this is something Miss Radliff mentioned. Remember, two months into the service plan, Miss Denton gave her an unsatisfactory rating when she was on the waiting list to get into catheterities counseling, but hadn't been given a place yet. She found her unsatisfactory because of housing, but she was living with her mother, found her unsatisfactory on the issue of staying out of criminal problems. On an anonymous letter, somebody sent her saying, Miss Denton had a warrant in South Carolina. It wasn't even verified. Unsatisfactory? That's not an unsatisfactory rating. You're on the waiting list. Miss Brown testified that she did hold up her referrals to trial. I mean, this issue about the adopt-only family at the exchange isn't in a vacuum. When was the earlier termination case in relation to this one, do you recall? I don't know the answer to that. Mr. Kress, is it in the record how many cases the judge had set that day? I don't think it would be in the record. Is it still a cattle call? There were other cases that day. Scheduled? There were other cases. I believe we came in after the domestic violence call, and we were not the only case that day. Thank you. So if you have no further questions, we ask that you reverse the trial court's decision and remand the case for further hearing. Thank you, counsel. I take this matter under the advisory of the Dean of the Research Institute of Alabama Court.